UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

CINDY YOUNG,                      )
                                 )
        Plaintiff,               )
                                 )
        v.                       )        No. 1:25-cv-00472-LM-TSM
                                 )
GARLAND, *et al.*,               )
                                 )
        Defendants.              )

―――――――――――――――――――

MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS

Plaintiff Cindy L. Young, who was convicted of four federal misdemeanors for her part in

the January 6, 2021 attack on the United States Capitol,[1] alleges that Defendants, the Department

of Justice ("DOJ"), the Federal Bureau of Investigation ("FBI"), and FBI Special Agent ("SA")

Wesley Garland, violated her constitutional rights and various federal statutes by collecting a

sample of her DNA when she self-surrendered on those charges at the federal courthouse in

Concord, New Hampshire, on June 23, 2023.  2d Am. Comp. (ECF No. 31.)  Her claim that SA

Garland violated her Fourth Amendment rights misapprehends his statutory authority to collect

DNA under those circumstances, falls outside the narrow scope of remedy available under *Bivens*

*v. Six Unknown Narcotics Agents*, 403 U.S. 388 (1971), and fails because SA Garland is

protected by qualified immunity.  Her allegation that the FBI and DOJ exceeded their authority

by allowing SA Garland to take her DNA sample is unsupported by statute or precedent.  Her

assertion that her DNA collection violated Equal Protection because January 6 defendants were

---

[1] 18 U.S.C. 1752(a)(1), Entering and Remaining in a Restricted Building; 118 U.S.C. 1752(a)(2), Disorderly and Disruptive Conduct in a Restricted Building; 240 U.S.C. 5104(e)(2)(D), Violent Entry and Disorderly Conduct in a Capitol Building; 40 U.S.C. 5104(e)(2)(G) Parading, Demonstrating, or Picketing in a Capitol Building.  *See* Judgment, *United States v. Cindy Young*, 1:23-cr-00241-TSC-GMH (D.D.C.) (ECF No. 113).

treated differently from Black Lives Matters protesters compares ignores the fact that the two groups were differently situated.  And because she cannot establish that retention of her DNA sample in unlawful, she is not entitled to the declarative and injunctive relief that she seeks.  In short, she has failed to state a claim on which relief may be granted, and therefore, her Complaint should be dismissed under Federal Rule of Civil Procedure 12(b)(6).

BACKGROUND

On January 6, 2021, Plaintiff was present at and participated in the attack on the United States Capitol.  *United States v. Cindy Young*, 1:23-cr-00241-TSC-GMH (D.D.C.), Judgment (ECF No. 113).  She was subsequently charged with four misdemeanor violations of federal law in the United States District Court for the District of Columbia.  *Id.*, Compl. (ECF No. 1).

On June 23, 2023, Plaintiff self-surrendered to the U.S. Marshals for the District of New Hampshire on those charges.  *See United States v. Young*, No. 1:23-mj-128 (D.N.H.).  She alleges that while she was being processed by the U.S. Marshals Service at the federal courthouse in Concord, New Hampshire, SA Garland entered the room, told her, "This is the last thing we are required to do," and then swabbed the inside of her cheek to collect a DNA sample "without warrant, consent, or documentation."  2d Am. Comp. at 2, 6 (ECF No. 31).

Plaintiff initially filed this action on November 20, 2025, but the operative complaint is her Second Amended Complaint, filed on April 22, 2026.  ECF No. 31.  It alleges four causes of action: first, SA Garland, acting in his individual capacity, violated her rights under the Fourth Amendment by "personally conducting a warrantless body search outside established booking procedures and without demonstrated statutory authority."  *Id.* at 8 (Count I). Second, the Department of Justice and the FBI exceeded the authority that Congress delegated to them in the DNA Fingerprint Act (34 U.S.C. § 40702), either because SA Garland acted outside the authority

found at that statute's regulations (28 C.F.R. § 28.12), or because the regulations themselves exceed the delegated authority. *Id.* at 9-11 (Count II). Third, the Department of Justice and FBI's disparate treatment of participants in the January 6 attack on the Capitol, who were supporting a white man (Donald Trump), and participants in the 2020 Black Lives Matter ("BLM") protests, who were supporting a black man (George Floyd) violates her Fourteenth Amendment right to Equal Protection. *Id.* at 11-13 (Count III.) Fourth, she seeks a declaration that collection and retention of her DNA are unlawful, and an injunction requiring destruction of any retained sample, removal of her DNA profile from federal databases, and a written certification of compliance. *Id.* at 14-15 (Count IV). She therefore seeks compensatory and punitive damages against SA Garland, a declaratory judgment that taking her DNA sample violated the Fourth Amendment and continued retention of the sample or DNA profile is unlawful, and the injunctive relief identified in Count Four. *Id.* at 15-16.

## ARGUMENT

### I.    Legal standard.

To survive a motion under Rule 12(b)(6), a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A complaint meets this standard only if it "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "In making this plausibility determination, we isolate and ignore statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements." *Thornton v. Ipsen Biopharmaceuticals, Inc.*, 126 F.4th 76, 80-81 (1st Cir. 2025) (cleaned up).

3

Courts must "take the complaint's well-pled (i.e., non-conclusory, non-speculative) facts as true, drawing all reasonable inferences in the pleader's favor, and see if they plausibly narrate a claim for relief." *Schatz*, 669 F.3d at 50.  However, while courts "ordinarily" assume the plaintiff's allegations are true, "some allegations, while not stating ultimate legal conclusions, are nevertheless so threadbare or speculative that they fail to cross the line between the conclusory and the factual." *Penalbert-Rosa v. Fortuno-Burset*, 631 F.3d 592, 595 (1st Cir. 2011) (cleaned up).

Plaintiff has failed to meet the standard set by Rule 12(b)(6), and her Complaint must be dismissed.

II.     <u>Plaintiff has failed to state a claim that SA Garland's collection of her DNA was in any way unlawful.</u>

A. <u>SA Garland's collection of Plaintiff's DNA was authorized by statute.</u>

Plaintiff's allegations against SA Garland fail in the face of the plain language of the governing statute and regulations because FBI agents are authorized DNA collectors under the DNA Fingerprint Act and 28 C.F.R. § 28.12.  The DNA Fingerprint Act, codified at 34 U.S.C. § 40702, provides that

> From individuals in custody . . . [t]he Attorney General may, as prescribed by the Attorney General in regulation, collect DNA samples[2] from individuals who are arrested, facing charges, or convicted or from non-United States persons who are detained under the authority of the United States.

The statute does not qualify "arrested" or "facing charges" or limit collection based on the nature of the offense on which the individual has been arrested, charged, or convicted.

---

[2] The statute defines "DNA sample" as "a tissue, fluid, or other bodily sample of an individual on which a DNA analysis can be carried out."  28 U.S.C. § 40702(c)(1).

By regulation, the Attorney General has exercised this authority broadly, directing all federal law enforcement agencies, including the FBI, to collect DNA samples from all arrestees, other than juveniles, regardless of the federal offense involved.  28 C.F.R. § 28.12 ("*Any* agency of the United States that arrests or detains individuals or supervises individuals facing charges *shall* collect DNA samples from individuals who are arrested, facing charges, or convicted . . .") (emphasis added); *see also* 28 U.S.C. § 534(a) ("The Attorney General shall . . . acquire, collect, classify, and preserve identification, criminal identification, crime, and other records."); *United States v. Mitchell*, 652 F.3d 387, 415 (3d Cir. 2011) ("[O]nce the Attorney General has determined that DNA must be collected, there is no room for law enforcement officials to exercise (or abuse) discretion by deciding whether or not to collect a DNA sample.").

This delegation to Department of Justice law enforcement agencies is expressly allowed by statute, which provides that the Attorney General "may delegate this function within the Department of Justice," including by "authoriz[ing] and direct[ing] any other agency of the United States that arrests or detains individuals or supervises individuals facing charges to carry out any function and exercise any power of the Attorney General under this section."  34 U.S.C. § 40702(a)(1)(A).  And the FBI is an agency within the Department of Justice.  *See* U.S. Dep't of Justice, "Agencies," justice.gov, https://www.justice.gov/agencies/chart (last viewed Feb. 6, 2026).

Plaintiff's statutory objections to the collection of her DNA are all unavailing.  She asserts that "Defendant Garland did not present a warrant authorizing DNA collection, did not provide written advisement, and did not demonstrate that he was acting pursuant to structured booking procedures or formal designation as the collecting authority at that facility."  2d Am. Compl. at 8.  But nothing in the DNA Fingerprint Act or its regulations required SA Garland to

take any of these actions.  The statute authorizes collection of DNA samples and does not condition that authority on obtaining a warrant or presenting the person providing the sample with any documentation.  In fact, consent for this collection is not required, and criminal penalties may follow from failing to comply.  34 U.S.C. §§ 40702(a)(4) (authorizing "the use of such means as are reasonably necessary to detain, restrain, and collect a DNA sample from an individual who refuses to cooperate in the collection of the sample"), (a)(5) (failure to cooperate in collection of a DNA sample is punishable as a misdemeanor).  In short, Plaintiff had no right to refuse to provide a DNA sample, and thus no consent form or opportunity to decline were required.

Plaintiff also argues that the government interest in collecting her DNA was "minimal" because her case involved "voluntary surrender, low-risk classification, known identity, nonviolent misdemeanor charges, and absence of custodial necessity."  2d Am. Compl. at 8.  But in so arguing, she fails to acknowledge what other courts have described as the government's "compelling" interest in DNA collection.  In 2008, the Circuit Court for the District of Columbia rejected a federal prisoner's argument that collection of his DNA under an earlier version of the DNA Fingerprint Act was unlawful in part because he was "a first-time offender convicted of a non-violent crime that did not turn on DNA evidence."  *Kaemmerling v. Lappin*, 553 F.3d 669, 680-84 (D.C. Cir. 2008) (collecting cases).  Instead, the court held, "[t]he DNA Act serves the compelling governmental interest in accurately and expeditiously solving past and future crimes in order to protect the public and ensure conviction of the guilty and exoneration of the innocent," which the plaintiff's minimal crime and limited criminal history did not outweigh.  *Id.* at 680.

B.   SA Garland's collection of Plaintiff's DNA did not violate the Fourth Amendment.

Plaintiff has also failed to state a claim that collection of her DNA violated her Fourth Amendment rights.  In 2013, the Supreme Court upheld a state analogue to the DNA Fingerprint Act in *Maryland v. King*, which required law enforcement officers in Maryland to use buccal swabs to collect DNA samples from persons arrested for "serious" crimes.  569 U.S. 435 (2013).

The qualifying crimes were a crime of violence, which included murder, rape, first-degree assault, kidnaping, arson, sexual assault, and a variety of other serious crimes, or an attempt to commit a crime of violence, or burglary or an attempt to commit burglary.  *Id.* at 443. While the qualifier that the Maryland crimes must "serious" arguably distinguishes that law from the DNA Fingerprint Act, the Supreme Court also noted that "twenty-eight States and the Federal Government have adopted laws similar to the Maryland Act authorizing the collection of DNA from some or all arrestees."  *Id.* at 445.  Further, the compelling government interests that the Supreme Court identified in upholding the statute centered primarily around identifying persons taken into custody, including "the need for law enforcement officers in a safe and accurate way to process and identify the persons and possessions they must take into custody;" the fact that "in every criminal case, it is known and must be known who has been arrested and who is being tried;" the need to accurately identify an arrestee's criminal history; and "ensuring that persons accused of crimes are available for trial." *Id.* at 449-52.  These considerations apply equally to someone arrested for misdemeanors as well as felonies.

Further, while few courts have directly addressed the constitutionality of § 40702, all have found it constitutional.  In *United States v. Mitchell*, the Third Circuit addressed an earlier version of the Act and held that "under the totality of the circumstances, given arrestees' and pretrial detainees' diminished expectations of privacy in their identities and the Government's

7

legitimate interests in the collection of DNA from these individuals, we conclude that such collection is reasonable and does not violate the Fourth Amendment." 652 F.3d 387 (3d Cir. 2011) (addressing 42 U.S.C. § 14135a(a)(1)(A); *see United States v. Fricosu*, 844 F. Supp. 2d 1201 (D. Colo. 2012) (following *Mitchell*); *United States v. Buller*, No. 4:17-CR-40105-KES, 2018 WL 317820, at *5-6 (D.S.D. Jan. 5, 2018) (noting that the Supreme Court did not limit the King holding to persons arrested on "only serious felonies," and holding that "there appears to be no reason to distinguish DNA collection from misdemeanor arrestees as opposed to felony arrestees"); *see also Haskell v. Brown*, 677 F. Supp. 2d 1187, 1196-98 (N.D. Cal. 2009) (upholding California state law requiring arrestees to submit DNA samples, because arrestees "have a lesser privacy interest than the general population," plaintiffs had not argued "that they cannot reasonably be forced to identify themselves upon arrest through photographs or fingerprints," nor had they "articulated how DNA differs in a legally significant way from other means of identification").

Plaintiff is correct that "the Supreme Court has recognized that compelled bodily intrusions implicate significant privacy and dignity interests," but the cases she cites nonetheless do not support the conclusion that the collection of an arrestee's DNA through a buccal swab violates the Fourth Amendment. 2d. Am. Compl. at 7. *Schmerber v. California* held that there was no Fourth Amendment violation in a compelled blood draw of a person arrested for driving under the influence to test his blood alcohol content – a much more intrusive process than a buccal swab. 384 U.S. 757, 771 (1966) (noting that blood tests "are a commonplace in these days of periodic physical examination and experience with them teaches that the quantity of blood extracted is minimal, and that for most people the procedure involves virtually no risk, trauma, or pain"). The *Schmerber* court emphasized that tis holding was limited to "the facts of

the present record," but nonetheless described the blood draw as a "minor intrusion[] into an individual's body." *Id.* at 772.

Conversely, in *Winston v. Lee*, the Supreme Court rejected the Commonwealth of Virginia's attempt "to compel the respondent . . . who is suspected of attempting to commit armed robbery, to undergo a surgical procedure under a general anesthetic for removal of a bullet lodged in his chest," concluding that the procedure was "an example of the " 'more substantial intrusion' " cautioned against in *Schmerber*." 470 U.S. 753, 755 (1985). Elsewhere in the opinion, the court described the state's intent as to "to take control of respondent's body, to drug this citizen – not yet convicted of a criminal offense – with narcotics and barbiturates into a state of unconsciousness, and then to search beneath his skin for evidence of a crime." *Id.* at 765.

Here, the minimal intrusion of a buccal swab, combined with the reduced expectation of privacy when being booked on criminal charges and the government's interest in determining the identity of its arrestees, compels the conclusion that DNA collection on reporting to court is not protected by the Fourth Amendment.

C. Plaintiff's *Bivens* claim against SA Garland is precluded by the Supreme Court's ruling in *Egbert v. Boule.*

Even if Plaintiff were correct that SA Garland lacked authorization to collect her DNA– which she is not – she fails to state a claim under *Bivens v. Six Unknown Narcotics Agents*, 403 U.S. 388 (1971). Congress has never passed a law authorizing courts to award damages against federal officials who violate the Constitution while acting under color of federal law. *Ziglar v. Abbasi*, 582 U.S. 120, 130 (2017). In *Bivens*, the Supreme Court implied a cause of action allowing such suits, "to deter individual federal officers from committing constitutional violations." *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 70 (2001). However, the Supreme Court has only recognized *Bivens* claims in three contexts: law enforcement's use of excessive

force in violation of the Fourth Amendment (*Bivens*, 403 U.S. 388); sex discrimination in employment, in violation the Fifth Amendment (*Davis v. Passman*, 442 U.S. 228 (1979)); and failure to provide a prisoner with adequate medical treatment in violation of the Eighth Amendment (*Carlson v. Green*, 446 U.S. 14 (1980)).  Since these three cases, the Supreme Court has consistently declined to extend the remedy to other contexts; such extension is now a "disfavored judicial activity."  *Abbasi*, 582 U.S. at 135.

Determining whether a plaintiff may seek a *Bivens* remedy requires two steps.  *Egbert v. Boule*, 596 U.S. 482, 492 (2022).  First, the court must determine "whether the plaintiff's claims arise in a 'new context' compared to" *Bivens*, *Davis*, or *Carlson*.  *Arias v. Herzon*, 150 F.4th 27, 30 (1st Cir. 2025) (quoting *Egbert*, 596 U.S. at 492).  The Supreme Court has not provided an exhaustive list of "differences that are meaningful enough to make a given context a new one," but has offered examples including "the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches."  *Ziglar v. Abbasi*, 582 U.S. 120, 140 (2017).

If the plaintiff's claims do not arise in a new context, the analysis ends, and the plaintiff's claims may move forward.  *Id.*  However, if the context is new, the court must next "determine whether there are 'special factors counselling hesitation' in extending the *Bivens* remedy to that context."  *Id.* (quoting *Abbasi*, 582 U.S. at 136).  If such a factor exists, the court may not allow the *Bivens* claim to proceed.

Plaintiff's claims clearly do not arise out of gender discrimination or medical treatment in prison.  And while she, like the plaintiff in *Bivens*, alleges a violation of her Fourth Amendment

rights, the facts of her case take it out of the context recognized in that case. In *Bivens*, federal agents entered the plaintiff's apartment without a warrant, arrested him on drug charges, manacled him in front of his wife and children, threatened to arrest his entire family, searched the entire apartment, and took him into custody, where he was strip searched. 403 U.S. 388, 389 (1971). The Supreme Court impassively summed this up by stating that "unreasonable force was employed in making the arrest." *Id.*

In contrast, Plaintiff does not claim unreasonable *force*, but an illegal *search*. As the First Circuit has held, "[t]he distinction is significant. An excessive force claim takes aim at the extent of the force used against the person rather than the extent to which an expectation of privacy has been infringed or a trespass has occurred." *Arias v. Herzon*, 150 F.4th 27, 39 (1st Cir. 2025) (charactering *Bivens* as an excessive force case). Plaintiff does not claim that SA Garland used any physical force to collect her DNA, let alone an excessive amount of force; rather, she takes issue with his statement that the collection was required at all, which she describes as "false," and the fact that he took the sample "outside established booking procedures and without demonstrated statutory authority." 2d Am. Compl. at 2, 8. What she describes is an invasion of privacy or trespass on her person regardless of the degree of force required. *See King*, 569 U.S. 446 (while acknowledging that a buccal swab is a search, describing it as a "gentle process," requiring "but a light touch on the inside of the cheek," and "no surgical intrusions beneath the skin," and a "negligible" intrusion). Although the plaintiff in *Bivens* also alleged that the search he experienced was an illegal invasion of his privacy because it was warrantless, the lack of unreasonable force alleged here creates a new context.

Other differences are also significant: the plaintiff in *Bivens* was searched in his home, the place which a person enjoys the highest expectation of privacy. *See Payton v. New York*, 445

U.S. 573, 585 (1980) ("[P]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.").  Plaintiff here, however, had her DNA sample taken at the federal courthouse, where she was being processed on criminal charges – a setting with a lower expectation of privacy, especially given that processing on a criminal charge involves collecting other identifying information like fingerprints and a photograph.  *See King*, 569 U.S. at 462 (2013) ("The expectations of privacy of an individual taken into police custody necessarily are of a diminished scope. . . . [B]oth the person and the property in his immediate possession may be searched at the station house," and such a search "may involve a relatively extensive exploration."). Moreover, SA Garland operated under a more specific and concrete "statutory or other legal mandate" than the officers in *Bivens*.  That search was warrantless, and the Supreme Court concluded that the arrest lacked probable cause, *Bivens*, 403 U.S. at 402; here, SA Garland was following the direct mandate of a statute and regulations addressing Plaintiff's specific circumstances.[3]

Lastly, here, unlike in *Bivens*, "the risk of disruptive intrusion by the Judiciary into the functioning of other branches" is high.  *Abbasi*, 582 U.S. at 140.  *Bivens* took as a given that the agents' search and seizure were unconstitutional under established constitutional principles; at issue was whether the plaintiff could seek money damages for the violation.  Here, however, SA Garland acted in accordance with a law issued by Congress to address the government's compelling interest in "accurately and expeditiously solving past and future crimes in order to protect the public and ensure conviction of the guilty and exoneration of the innocent," "accurately identifying convicted offenders," and "reducing recidivism."  *Kaemmerling*, 553 F.3d

---

[3] Notably, Plaintiff has not alleged that she does not belong to the group of people subject to the statute.

680-81.  To find that Plaintiff has stated a *Bivens* claim against SA Garland for carrying out duties expressly authorized by DNA Fingerprint Act would be a much more direct disruption into the Legislative branch's functioning than was at issue in *Bivens* itself.

Further, special factors counsel against extending a *Bivens* remedy here.  Allowing claims for damages against an FBI carrying out the Congressional mandate to collect DNA from arrestees risks hindering the significant government interest that the Supreme Court identified in *King*: "The need for law enforcement officers in a safe and accurate way to process and identify the persons and possessions they must take into custody."  *King*, 569 U.S. at 449.  Further, the Supreme Court has held that "a court may not fashion a *Bivens* remedy if Congress already has provided, or has authorized the Executive to provide, an alternative remedial structure."  *Egbert*, 596 U.S. at 493.  The Department of Justice's Office of the Inspector General ("OIG") accepts and investigates complaints about Department of Justice agencies, including the FBI.  *See* DOJ OIG, "Submitting a Complaint," oig.justice.gov, https://oig.justice.gov/hotline/submit_complaint (last viewed Feb. 6, 2026).  This office provides Plaintiff with an alternative remedial scheme that precludes extending *Bivens* to her alleged injury here.  *See Massaquoi v. Fed. Bureau of Investigation*, No. 22-55448, 2023 WL 5426738, at *2 (9th Cir. Aug. 23, 2023) (obligation of the OIG to investigate alleged improper conduct by Department of Justice personnel provided an alternative remedial scheme for plaintiff bringing *Bivens* claims); *Lewis v. Westfield*, 640 F. Supp. 3d 249, 254 (E.D.N.Y. 2022), *aff'd sub nom. Lewis v. Bartosh*, No. 22-3060-PR, 2023 WL 8613873 (2d Cir. Dec. 13, 2023) (same); *see also Pettibone v. Russell*, 59 F.4th 449, 456 (9th Cir. 2023) (same for Department of Homeland Security).

Thus, even if Plaintiff were correct that SA Garland violated the law in collecting her DNA samples, that claim extends beyond *Bivens'* current limited scope, and her Complaint must

13

be dismissed.

    D.  <u>SA Garland is protected by qualified immunity.</u>

Even if this Court chose to imply the damages remedy Plaintiff seeks, SA Garland is entitled to qualified immunity. Qualified immunity shields individual defendants from both liability and the burdens of litigation in the absence of allegations plausibly suggesting that they personally violated a clearly established constitutional right. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Macdonald v. Town of Eastham*, 745 F.3d 8, 12 (1st Cir. 2014). Thus, a plaintiff must both plausibly allege that an individual defendant violated his rights and complain of the violation of a clearly established right. Judges can choose which prong to address first. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Here, Plaintiff fails to allege a violation of a clearly established right. "A necessary concomitant to the determination of whether the constitutional right asserted by a plaintiff is 'clearly established' at the time the defendant acted is the determination of whether the plaintiff has asserted a violation of a constitutional right at all. Decision of this purely legal question permits courts expeditiously to weed out suits which fail the test without requiring a defendant who rightly claims qualified immunity to engage in expensive and time-consuming preparation to defend the suit on its merits." *Siegert v. Gilley*, 500 U.S. 226, 232 (1991).

A right is clearly established only if "the unconstitutionality of the officer's conduct . . . [is] beyond debate in light of an existing principle of law 'dictated by controlling authority or a robust consensus of cases of persuasive authority.'" *French v. Merrill*, 15 F.4th 116, 126 (1st Cir. 2021) (quoting *Wesby*, 583 U.S. at 63).

Plaintiff has failed to state a claim that any controlling authority or persuasive cases have established the unconstitutionality of SA Garland's actions. First, for the reasons stated above,

14

the collection of Plaintiff's DNA does not violate her Fourth Amendment rights; thus, she has not "asserted a violation of a constitutional right at all." *Siegert*, 500 U.S. at 232. However, even if Plaintiff succeeded in alleging a violation of her Fourth Amendment rights, she cannot establish that, as someone arrested on federal charges, her right not to have her DNA collected was "beyond debate." The DNA Fingerprint Act allows the Attorney General to collect DNA from arrestees and to delegate this function to elsewhere in the Department of Justice or any government agency involved arresting individuals facing charges. 34 U.S.C. § 40702(a)(1)(A). The statute remains good law; no court appears to have overturned the law or held it unconstitutional as applied to a specific plaintiff. While this alone may not determine whether Plaintiff had the constitutional right to refuse to provide a DNA sample (which she did not), it is strong evidence that no such right was clearly established. Thus, SA Garland is protected by qualified immunity.

III.     Plaintiff has failed to establish that that collection of her DNA was either *ultra vires* or agency action contrary to law.

Plaintiff next claims that the Department of Justice and FBI acted outside the authority delegated to those agencies by Congress when SA Garland collected her DNA sample. She argues that either "the governing regulations require DNA collection to occur through structured booking channels administered by designated officials," and therefore SA Garland acted outside the scope of delegated authority, or that the governing regulations themselves "exceed[] the statutory authority granted by Congress" in the DNA Fingerprint Act. 2d Am. Compl. at 10. But while this "conclusory statement [is] presented as an assertion of fact, [it] simply describes the legal conclusion that the plaintiff[] sought to infer from the other conduct alleged in the complaint." *Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 10 (1st Cir. 2011). That is, both

15

her alternative claims present legal conclusions couched as fact. And "legal conclusions contained within a complaint are not entitled to a presumption of truth." *Id.*

As already noted, the Attorney General has properly delegated the authority to collect DNA samples under the DNA Fingerprint Act to "[a]ny agency of the United States that arrests or detains individuals or supervises individuals facing charges" charging them to "collect DNA samples from individuals who are arrested, facing charges, or convicted, and from non-United States persons who are detained under the authority of the United States." 28 C.F.R. § 28.12(b). Nothing in the statute or regulation identifies or mandates what Plaintiff calls "structured booking procedures," "formal designation as the collecting authority for that facility," or "standardized custodial procedure," which appear to mean only that she believes the U.S. Marshals Service should have collected her DNA rather than SA Garland.[4]  2d. Am. Compl. at 10.  But in the absence of any further development, this is another legal conclusion masquerading as a factual allegation.

IV.    Plaintiff has failed to state a violation of Equal Protection.

Finally, Plaintiff alleges that the FBI and Department of Justice violated the Fourteenth Amendment's guarantee of Equal Protection because, she claims, people involved in the January 6 attack on the U.S. Capitol "faced much more aggressive federal prosecution" and had their DNA collected much more frequently than participants in the Black Lives Matter ("BLM")

---

[4] Nor does Plaintiff explain the practical difference between the U.S. Marshals collecting her DNA and SA Garland doing so.  The U.S. Marshals Service, like the FBI, is an "agency of the United States that arrests or detains individuals or supervises individuals facing charges," and therefore also authorized to collect DNA under 28 C.F.R. § 28.12(b).  Nonetheless, all DNA samples collected under the DNA Fingerprint Act "shall [be] furnish[ed] to" the FBI, and thus, the outcome of her DNA collection would have been the same whether it had been conducted by the U.S. Marshals or the FBI.  28 CFR 28.12(f)(2).

protests of 2020.  2d Am. Compl. at 6-7, 11-13.  Because Plaintiff is drawing comparisons between people who are not similarly situated, her claims must fail.

The Supreme Court has warned that that standard for proving a selective prosecution claim like Plaintiff's "is a demanding one."  *United States v. Armstrong*, 517 U.S. 456, 463 (1996).  While of course prosecutors may not prosecute on "an unjustifiable standard such as race, religion, or other arbitrary classification," they also enjoy a "presumption of regularity" and "in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties."  *Id.* at 464 (cleaned up).  Thus, to establish a selective prosecution claim, a party must allege that "federal prosecutorial policy had a discriminatory effect and that it was motivated by a discriminatory purpose," and "[t]o establish a discriminatory effect in a race case, the claimant must show that similarly situated individuals of a different race were not prosecuted."  *Id.* at 465 (cleaned up).  A prosecution is motivated by a discriminatory purpose when a defendant was prosecuted  "because of" his membership in an identifiable group.  *Wayte v. United States*, 470 U.S. 598, 610 (1985).

Plaintiff has not sufficiently alleged facts to support either prong of this standard. Notably, the U.S. District Court for the District of Columbia denied her motion to dismiss her own criminal charges on the same grounds; the court's analysis there is persuasive and provides guidance to this Court.  *United States v. Young*, No. 23-CR-241 (GMH), 2024 WL 3030656 *4-5 (D.D.C. June 17, 2024) (pointing to differences between the charges the Plaintiff faced and the charges BLM supporters faced; finding Plaintiff's claims about lack of prosecution of BLM protesters to be "generalized" and "unsupported;" agreeing with the government that "no rioter in the [BLM] incidents mentioned breached a building where the Vice President was present to certify the 2020 Presidential Election and came within feet of the very room where the

certification was taking place," as it alleged Plaintiff did; and finding that "numerous judges in this District have found that the protests surrounding the death of George Floyd are not like events of January 6") (cleaned up).

Plaintiff's arguments to this Court suffer from the same deficiency identified by the U.S. District Court for the District of Columbia: she has not alleged facts that establish the January 6 defendants were so similarly situated to BLM protesters that they can appropriately be compared. Her primary concern, as pertinent to this Complaint, is that because BLM-related arrests were "overwhelmingly handled at the state or local level for misdemeanors," they required DNA collection much less often than the federal prosecutions that the January 6 defendants faced. 2d Am. Compl. at 12-13. But this claim itself recognizes that the two groups were not similarly situated because they were prosecuted by different sovereigns. There is a simple reason why the January 6 defendants faced "more aggressive federal prosecution" than BLM protesters: the January 6 attack at the Capitol took place on federal property, in the federal District of Columbia. Federal authorities have exclusive jurisdiction over the District of Columbia, and it is governed by federal law. *See* U.S. Const. art. I, § 8, cl. 17 (establishing a ten-mile square district where Congress would "exercise exclusive legislation in all cases whatsoever). There were no state charges available to the January 6 defendants.

Conversely, BLM protests in 2020 were not limited to places under federal jurisdiction; George Floyd was murdered on a Minneapolis street corner, and the protests took place throughout the city, under the jurisdiction of Minnesota state law enforcement and prosecution. *See* New York Times, How George Floyd Died and What Happened Next, NEW YORK TIMES, July 29, 2022, https://www.nytimes.com/article/george-floyd.html. Plaintiff has not alleged facts establishing that the Department of Justice and FBI had any authority over how BLA protesters

18

were charged, or whether those charged with misdemeanors were required to provide DNA samples.

Nor does her comparison of two BLM protesters' sentences with two January 6 defendants' sentences support a claim of selective prosecution. First, a comparison of four defendants is insufficient to demonstrate any kind of consistent bias. Second, Plaintiff considers it unfair that Christopher Quaglin received 144 months for "pushing an officer" on January 6 while Montez Terriel Lee, Jr. received two years less for arson that resulted in death during the BLM riots, and that the government recommended that Bryce Michael Williams be sentenced to 42 months for arson during the BLM riots, while Richard Barnett ("J6 defendant who placed feet on a desk") received a sentence of 54 months.[5] 2d Am. Compl. at 4. But the January 6 and BLM defendants were each charged with entirely disparate offenses, committed at different times and under different circumstances and carrying different guideline ranges. Nor do the public dockets contain all the information on which the judge would have relied at sentencing, including details such as the defendants' criminal, family, medical and psychological histories, and their conduct before trial. The offense of conviction and sentences received, standing alone, cannot support a claim of selective prosecution.

Finally, even if Plaintiff could show disparate impact – which she cannot – she has alleged no facts to support the claim that such an impact was motivated by a discriminatory purpose. Any such claims are yet more conclusory assertions of legal conclusions. Even the distinction Plaintiff draws between who she considers each side is supporting – George Floyd

---

[5] Defendant notes that Christopher Quaglin was not convicted of "J6 misdemeanors," but of twelve federal felonies, and the government's sentencing memorandum suggests that his actions on January 6 involved much more serious acts than simply "pushing an officer," including "assaulting multiple officers" for multiple hours. *See United States v. Quaglin*, 1:21-cr-00040-TNM (D.D.C.) (ECF No. 763 at 2-3).

("black") and Donald Trump ("white") – fails to consider the myriad ways in which those two figures are differently situated apart from their race.

Because Plaintiff cannot meet the demanding standard to plead a selective prosecution claim, her Second Amended Complaint should be denied.

V.      <u>Plaintiff is not entitled to declaratory or injunctive relief.</u>

Because Plaintiff has failed to state a claim that SA Garland's collection of her DNA was in any way unlawful, her requests for declaratory and injunctive relief must be denied.

CONCLUSION

For the above reasons, Plaintiff has failed to allege facts sufficient to support her claims against Defendants, and her Complaint should be dismissed under Rule 12(b)(6). .

Respectfully submitted,

Erin Creegan
United States Attorney

Dated: May 7, 2026                    /s/ Anna Dronzek
                                      Assistant U.S. Attorney
                                      Colorado Bar # 43912
                                      53 Pleasant Street, 5th Floor
                                      Concord, New Hampshire 03301
                                      (603) 225-1552
                                      anna.dronzek@usdoj.gov